# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 19-848

**KIMBERLY BROOKE LABAUVE, ET AL.**

**VERSUS**

**LOUISIANA MEDICAL MUTUAL INS. CO., ET AL.**

**********

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. C-249-14
HONORABLE STEVE GUNNELL, DISTRICT JUDGE

**********

## VAN H. KYZAR
## JUDGE

**********

Court composed of Sylvia R. Cooks, Chief Judge, and John D. Saunders, Elizabeth Pickett, Shannon Gremillion, and Van H. Kyzar, Judges.

**JUDGMENT VACATED AND RENDERED.**

**Pickett, J., dissents and assigns written reasons.**

# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**19-848**


**KIMBERLY BROOKE LABAUVE, ET AL.**

**VERSUS**

**LOUISIANA MEDICAL MUTUAL INS. CO., ET AL.**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. C-249-14
HONORABLE STEVE GUNNELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## VAN H. KYZAR
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Chief Judge, and John D. Saunders, Elizabeth Pickett, Shannon Gremillion, and Van H. Kyzar, Judges.


**JUDGMENT VACATED AND RENDERED.**

**Charles Roger Moore**
**Sarah E. Hunter**
**Moore & Hunter APLC**
**6513 Perkins Road**
**Baton Rouge, LA 70808**
**(225) 766-1100**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Kimberly Brooke LaBauve**
    **Shawnavon Lynn LaBauve**
    **Individually and on behalf of Molly Ann LaBauve**

**James J. Hautot, Jr.**
**Judice & Adley**
**P. O. Drawer 51769**
**Lafayette, LA 70503-1769**
**(337) 235-2405**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Dr. Darryl Elias, Jr.**
    **LHA Physicians' Trust Fund**

**KYZAR, Judge.**

Plaintiffs, Kimberly Brooke LaBauve and Shawnavon Lynn LaBauve, individually and on behalf of their minor daughter Molly Ann LaBauve, appeal the judgment of the trial court dismissing their medical malpractice claim against Defendants, Dr. Darryl Elias, Jr. and LHA Physicians' Trust Fund, based on a jury verdict finding that the treatment rendered by Dr. Elias did not fall below the standard of care. For the reasons herein, we vacate the judgment of the trial court and render judgment in favor of Plaintiffs.

## FACTS AND PROCEDURAL HISTORY

This medical malpractice litigation began on April 22, 2014, when the LaBauves, individually and on behalf of their minor daughter Molly, filed a petition against Dr. Elias and his insurer, LHA Physicians' Trust Fund (referred to collectively as Defendant), alleging that Dr. Elias breached the standard of care during the birth and delivery of Molly on December 23, 2011. More particularly, Plaintiffs allege that Dr. Elias was negligent in the amount of force applied during the delivery and in failing to use other accepted protocols for delivery. As a result, Molly suffered a severe global brachial plexus injury and the permanent loss of use of her right arm. Dr. Elias denies that it was his applied force that caused Molly's injury, but rather it was the maternal forces of labor or other unknown factors that Molly was subjected to during birth that caused her injury. He claimed in answer that he complied with the accepted standard of care.[1]

Trial by jury was held beginning October 17, 2018. At the conclusion of the trial, the jury returned a verdict in favor of Dr. Elias finding that he did not breach the medical standard of care in his delivery of Molly. The facts presented are

---

[1] The matter had previously been submitted to a medical review panel that rendered an opinion favorable to Dr. Elias.

uncontested that Dr. Elias was the obstetrics physician on call when Mrs. LaBauve presented in labor, and he delivered Molly on December 23, 2011. During the delivery process, Molly was diagnosed with shoulder dystocia. Shoulder dystocia is most often defined as a delivery that requires additional obstetric maneuvers following failure of gentle downward traction on the fetal head to effect delivery of the shoulders. Shoulder dystocia is caused by the impaction of the child's anterior shoulder behind the maternal pubis symphysis. It also can occur from impaction of the child's posterior shoulder on the sacral promontory. Shoulder dystocia is an obstetrical emergency because the child needs to be delivered within minutes, as she is unable to breathe on her own or via the umbilical cord due to the compression and the forces of labor. During the birthing process, Molly sustained a severe brachial plexus injury when the nerves that run from her cervical spine down her arm at the C5, C6, and C7 levels were pulled completely from the spine and the nerves at the C8 and T1 thoracic spine levels were partially pulled from her spine. This injury caused Molly to lose almost all function in her right arm.

In support of their case, both Mr. and Mrs. LaBauve testified. In addition, Plaintiffs called as witnesses, Dr. Edith Gurewitsch Allen, accepted as an expert in Obstetrics and Gynecology (OB/GYN) specializing in maternal fetal medicine and shoulder dystocia and delivery-related mechanical injuries; Dr. Robert Allen, Ph.D., accepted as an expert in the field of Biomedical Engineering with a specialty in birthing mechanics; and Dr. Scott Kozin, Molly's treating physician, accepted as an expert in the field of Pediatric Orthopedics, with a subspeciality in brachial plexus injuries. In addition, the jury heard the testimony of Stephanie Chalfin, M.S., accepted as an expert life care planner, Dr. G. Randolph Rice, Ph.D., an expert economist, and heard from both Molly's physical therapist, Lorain Gilbert Fontana, and her teacher's aide at school, Tracie Klumpp.

2

In defense, Dr. Elias presented the testimony of Registered Nurse Rachelle Meaux, who assisted Dr. Elias during the delivery, and Dr. Michele Grimm, Ph.D., who was accepted as an expert in Biomedical Engineering and Brachial Plexus Engineering and was brought on after Dr. Henry Lerner, OB/GYN, withdrew from the case. Dr. Elias also called Dr. Ralph Joseph Fernandez, OB/GYN, who was a member of the Medical Review Panel. Finally, Dr. Elias testified after being accepted by the trial court as an expert in Obstetrics and Gynecology.

Before and during trial, Plaintiffs filed a motion to exclude or limit the testimony and opinions of Dr. Grimm. This motion was denied. Dr. Elias also filed a motion in limine to strike portions of the testimony of Plaintiffs' expert Dr. Kozin, Molly's treating orthopedic surgeon. Dr. Elias' motion was granted by the trial court. Following a five-day trial on the merits, judgment was rendered in favor of Dr. Elias, with the jury finding that he did not breach the standard of care. An initial appeal to this court was dismissed in an unpublished opinion remanding the matter to the trial court to prepare and sign a final judgment with proper decretal language. *LaBauve v. La Med. Mut. Ins. Co.*, 19-451 (La.App. 3 Cir. 7/31/19). The trial court signed a new final judgment on August 30, 2019, and the instant appeal followed.

On appeal, Plaintiffs assert four assignments of error, as follow:

1. The trial court erred in granting defendants' motion to exclude plaintiff expert and treating physician Dr. Scott Kozin's testimony that the cause of Molly's injuries was the force applied by the delivering physician, and not the "maternal forces of labor";

2. The trial court erred in failing to grant plaintiffs' *Daubert* motion to exclude the testimony and opinions of defense engineering expert Michele Grimm, Ph.D., as her opinions and testimony are not based on sufficient data and facts, her principles and methods are not reliable, and she does not reliably apply them to Molly;

3. Alternatively, the trial court erred in failing to sustain plaintiffs' objections to Dr. Grimm's testimony and opinions on medical issues and the cause of Molly's injury, which are outside of her area of specialty as an engineer, unsupported by the existing literature,

3

case studies, and other data on permanent brachial plexus injuries involving multi-level, frank avulsions, and unsupported by the medical record or any medical doctor.

4. In light of the totality of the evidence at trial, the jury erred in determining that Dr. Elias did not breach the standard of care for an obstetrician in his treatment of Molly LaBauve, which error rises to the level of reversible manifest error.

## DISCUSSION

The question of whether there was error in the evidentiary issues as posed by the first three allegations of error necessarily impacts the propriety of the jury determination that the evidence did not support the finding that Dr. Elias breached the appropriate medical standard of care. As such, we are required to first address each and do so in the order presented.

### *Dr. Scott Kozin, M.D.*

Plaintiffs first argue that the trial court erred in granting Defendant's motion to exclude Dr. Kozin's testimony. The portion of Dr. Kozin's testimony challenged is that part opining that the cause of Molly's injuries was the force applied by Dr. Elias and not the "maternal forces of labor" as asserted by Defendant. Defendant's motion to exclude this aspect of the testimony asserted that "Dr. Kozin is an orthopedic surgeon who treated Molly Labauve [sic] after she sustained a brachial plexus injury[]" and that he "is not a biomechanical engineer, is not an obstetrician, and he is not qualified to offer testimony regarding the mechanism of injury in this matter."

The theory of Plaintiffs' claim against Dr. Elias is that he used excessive force in his use of forceps to deliver Molly after she experienced shoulder dystocia during the birthing process. Plaintiffs assert that the application of force used by Dr. Elias was far greater than the forces that are exerted naturally from maternal forces of labor, the uterine force exerted by the mother during the labor and birthing process.

4

While the trial court permitted Dr. Kozin to testify, it granted Defendant's motion in limine refusing to allow him to testify as to the cause of Molly's total avulsion nerve injury which resulted in the permanent loss of use of her arm. In reaching this decision, the trial court provided oral reasons for judgment as follows:

> And I'm okay with him saying that, but what I have a problem of him saying is that Dr. Elias caused the injury by some action. He wasn't there, and he's not an OB-GYN. He can say what happened to the nerves, that they were tore, okay. That's in his expertise. But he cannot say what Dr. Elias did or did not do. That is my concern here 'cause I think it's too prejudicial to the jury, all right. That's - - that's what I'm limiting only in this matter. He can say they were ripped out. He can say they were tore. They were not suppose [sic] to be that way, okay. But then to go to the actual and say Dr. Elias' actions caused this damage, I have a problem with, okay.

The trial court has great discretion in determining who should qualify as an expert and whether expert testimony is admissible, and its decision in regards to expert testimony will not be upset on appeal unless it is clearly erroneous. *Mistich v. Volkswagon of Ger., Inc.*, 95-939 (La. 1/129/96), 666 So.2d 1073; *Massie v. Cenac Towing Co., Inc.*, 00-1596 (La.App. 3 Cir. 4/25/01), 796 So.2d 14, *writ denied*, 01-1511 (La. 8/31/01), 795 So.2d 1213. The abuse of discretion standard is highly deferential, though it is not absolute.

> The abuse-of-discretion standard is highly deferential to the trial judge's determination under consideration. *See LCR-M Ltd. P'ship v. Jim Hotard Prop., L.L.C.*, 13-0483, p. 9 (La.App. 4 Cir. 10/9/13), 126 So.3d 668, 675. An abuse of discretion generally results from a conclusion reached capriciously or in an arbitrary manner. *See Tugwell v. Plaquemines Parish Gov't*, 14-0657, p. 5 (La.App. 4 Cir. 11/19/14), 154 So.3d 695, 699. "Arbitrary or capricious" means the absence of a rational basis for the action taken. *See A.S. v. D.S.*, 14-1098, p. 17 (La.App. 4 Cir. 4/8/15), 165 So.3d 247, 257. And a court necessarily abuses its discretion if its ruling is based on an erroneous view of the law. *See Show & Tell of New Orleans, L.L.C. v. Fellowship Missionary Baptist Church*, 14-0843, p. 8 (La.App. 4 Cir. 12/17/14), 156 So.3d 1234, 1240.

*Boudreaux v. Bollinger Shipyard*, 15-958, 15-1345, p. 16 (La.App. 4 Cir. 6/22/16), 197 So.3d 761, 771.

The question posed is whether Dr. Kozin should have been permitted to testify as to the cause of Molly's injuries, not whether Dr. Elias did or did not violate the appropriate standard of care, and, thus, is potentially liable for medical malpractice. The two issues are not the same. The actual force applied by Dr. Elias during the delivery process may or may not have been appropriate under the standard of care. While Dr. Kozin, as an orthopedic surgeon, may not be qualified to give an opinion as to the standard of care applicable to an OB/GYN physician, he is qualified to testify as to the amount of force necessary to completely avulse all five nerves of the brachial plexus of a child during delivery, whether those forces exceed the normal maternal forces of labor, and whether Dr. Elias was the only other source of the force necessary to cause the nerve avulsion injury suffered by Molly. Dr. Kozin is the only expert to testify who has actually treated and observed the nerves of injured children and, in particular, the brachial plexus nerves. He has also specifically observed Molly's nerves. This is causation expert opinion testimony, not expert testimony on a primary issue for the jury, which is whether medical malpractice occurred.

The trial court reasoned that Dr. Kozin could not testify to what Dr. Elias did or did not do during the delivery process because he was not there and did not witness Dr. Elias' actions. This reasoning is flawed and ignores the role of an expert witness in a medical malpractice suit. An expert is permitted to testify and render opinions despite a lack of firsthand knowledge or observation. *Blair v. Coney*, 19-795 (La. 4/3/20), ___ So.3d ___. Further, the fact that Dr. Kozin is not an obstetrician is not grounds for excluding his testimony as related to the cause of Molly's injuries. *Pertuit v. Jefferson Parish Hosp. Serv. Dist. No. 2*, 14-752 (La.App. 5 Cir. 5/14/15), 170 So.3d 1106, *writ denied*, 15-1176 (La. 9/18/15), 178 So.3d 152. As recognized by the court in *Pertuit*, "where medical disciplines

6

overlap, it is appropriate to allow a specialist in one field to give expert testimony as to the standard of care applicable to areas of the practice of medicine common to both disciplines." *Id.* at 1110.

Dr. Kozin is eminently qualified to render an opinion on the diagnosis and treatment of brachial plexus injuries in newborns, having devoted a large portion of his practice to this specialty. He is particularly qualified to testify as to Molly's injuries and the cause thereof, as he is her treating orthopedic surgeon and has operated on her brachial plexus nerves. He specializes in the treatment of delivery-related brachial plexus injuries in children and sees roughly 250 new brachial plexus patients every year. He actually operates on infant brachial plexus nerves and is intimately familiar with Molly's nerves and the injuries thereto, having operated on them. Dr. Kozin is the founder and Chief of Staff of the Brachial Plexus Center at Shriners Hospital in Philadelphia, where children from all over the world are treated for brachial plexus birth injuries. He has written extensively on these types of injuries and teaches and lectures on the subject, including treatment, patterns of injury, biomechanical properties, degrees of injury, and brachial plexus nerve properties. We find the trial court abused its great discretion in ruling on the scope of Dr. Kozin's testimony. His testimony as an expert and treating physician was admissible despite the fact that he is not an obstetrician. Furthermore, we find the trial court committed legal error in its interpretation of the law prohibiting Dr. Kozin's testimony.

After ruling that Dr. Kozin was not qualified to testify as to the standard of care, the trial court then concluded that his testimony to the effect that Molly's injury was caused by Dr. Elias' use of force during the delivery, was too prejudicial and, thus, inadmissible. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

7

issues, or misleading the jury, or by considerations of undue delay, or waste of time." La.Code Evid. art. 403. Here, the trial court did not actually weigh the effect of the testimony as against its probative value in reaching its conclusion. Moreover, we fail to see any prejudice that could result from Dr. Kozin's testimony that in his opinion, the force applied by Dr. Elias in the delivery process was the cause of the total avulsion of the five brachial plexus nerves, as opposed to maternal forces of labor. This was pertinent testimony in his field of expertise. Importantly, he does not offer an opinion as to whether Dr. Elias' actions were proper or improper, i.e., within the standard of care or in violation thereof. Plaintiffs were indeed required to prove whether Dr. Elias committed medical negligence and whether that negligence was the cause of Molly's injuries. While the force Dr. Elias applied during the delivery process may or may not have been negligent given the appropriate standard of care, a causal relation between Dr. Elias' actions and Molly's injuries had to be proven. Given that the testimony was not offered as standard of care evidence and there was no showing that its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, we find the trial court erred in refusing to admit the same.

### *Michele Grimm, Ph.D.*

Plaintiffs next argue that the trial court erred in failing to grant their *Daubert*[2] motion to exclude the testimony and opinions of defense engineering expert Dr. Grimm. Plaintiffs more specifically assert that her opinions and testimony are not based on sufficient data and facts, her principles and methods are not reliable, and she does not reliably apply them to Molly. Alternatively, Plaintiffs argue the trial court erred in failing to sustain their objections to Dr. Grimm's testimony and

---

[2] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993).

8

opinions on medical issues and the cause of Molly's injury, as they are outside of her area of expertise as an engineer, unsupported by the existing literature, case studies, and other data on permanent brachial plexus injuries involving multi-level, frank avulsions, and unsupported by the medical record or any other medical expert.

The admissibility of expert testimony in this case is governed by La.Code of Evid. art. 702,[3] as it appeared in 2018:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

As previously stated, a trial court is afforded wide discretion in determining whether to allow a witness to testify as an expert, and its determination will not be disturbed on appeal unless clearly wrong. *Villa v. GEICO Cas. Ins. Co.*, 17-608 (La.App. 3 Cir. 2/15/18), 239 So.3d 346, *writs denied*, 18-439, 18-520 (La. 5/18/18), 242 So.3d 1226, 1227.

> In *Daubert*, the United States Supreme Court set a new standard to assist district courts in evaluating the admissibility of expert testimony. The new standard required the district courts to perform a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. 2786. *See also State v. Chauvin*, 2002-1188 (La.5/20/03), 846 So.2d 697, 700-01. In *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court held that the analysis established by *Daubert* is to be applied to determine the admissibility of all expert

---

[3] This article was amended by Acts 2019, No. 115, § 1, eff. June 5, 2019, though we cite here the article as it read at the time of trial in 2018.

testimony, not just scientific testimony. *Merlin*, 2000-1862 at p. 12, 789 So.2d at 718. The *Kumho Tire* case dealt specifically with the issue of whether *Daubert* applies to engineering expert testimony. 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238.

*Daubert* established the following non-exclusive factors to be considered by district courts to determine the admissibility of expert testimony:

> (1) The "testability" of the scientific theory or technique;
>
> (2) Whether the theory or technique has been subjected to peer review and publication;
>
> (3) The known or potential rate of error; and
>
> (4) Whether the methodology is generally accepted in the scientific community. *Daubert*, 509 U.S. at 592-94, 113 S.Ct. 2786. This court in *Foret* characterized the *Daubert* factors as "observations" which provide a "helpful guide for our lower courts in considering this difficult issue." 628 So.2d at 1123.

*Cheairs v. State ex rel. Dep't of Transp. & Dev.*, 03-680, p. 7 (La. 12/3/03), 861 So.2d 536, 541.

The *Daubert* factors are designed to "assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue." *State v. Chauvin*, 02-1188, p. 5 (La. 5/20/03) 846 So.3d 697, 701.

> The factual basis for an expert's opinion determines the reliability of the testimony. An unsupported opinion can offer no assistance to the fact finder, and should not be admitted as expert testimony. *Miramon v. Bradley*, 96-1872 (La.App. 1st Cir.9/23/97), 701 So.2d 475, 478. The trial court's inquiry must be tied to the specific facts of the particular case. The abuse of discretion standard applies to the district court's ultimate conclusion as to whether to exclude expert witness testimony and to the court's decisions as to how to determine reliability. *Brown v. City of Madisonville*, 07-2104, p. 4 (La.App. 1st Cir.11/24/08), 5 So.3d 874, 879. There is a crucial difference between questioning the methodology employed by an expert witness and questioning the application of that methodology or the ultimate conclusions derived from that application. Only a question of the validity of the methodology employed brings *Daubert* into play. *MSOF Corp. v. Exxon Corp.*, 04-0988 (La.App. 1st Cir.12/22/05), 934 So.2d 708, 718, *writ denied*, 06-1669 (La.10/6/06), 938 So.2d 78. However, if a district court conducts no *Daubert* analysis of any kind, the

10

exclusion of the expert's evidence without an evaluation of the relevant reliability factors is legal error. *Corkern*, 934 So.2d at 107.

*Carrier v. City of Amite*, 08-1092, pp. 4-5 (La.App. 1 Cir. 2/13/09), 6 So.3d 893, 897, *writ denied*, 09-919 (La. 6/5/09), 9 So.3d 874.

Dr. Grimm was added as a defense expert after the withdrawal of previously named defense expert Dr. Henry Lerner. Dr. Lerner, an OB/GYN, was replaced by Dr. Grimm, both of whom are members of the Sullivan Group, after much of the discovery had been conducted and his own discovery deposition had been taken. Defendant was informed by Dr. Lerner that he would be withdrawing from the matter in March 2017. Plaintiffs, however, were unaware that such a change had been made until the summer of 2018, when a letter was sent to Dr. Lerner regarding trial depositions and he responded that he would not be in attendance at trial. Plaintiffs were not informed of the inclusion of Dr. Grimm as a defense expert until a mere four months before trial.

Dr. Grimm's submitted opinions and conclusions are based primarily upon a 2003 computer-simulated study she completed where she modeled a brachial plexus based on the tibial nerves in rabbits and other animal studies. Defendants admit this study has not been peer-reviewed. Nevertheless, Dr. Grimm's own conclusions assert that the brachial plexus nerves of an infant can stretch between fourteen and eighteen percent based on maternal forces of labor alone. This is undisputed by the medical community. However, the medical community understands that an infant's nerves can stretch between thirty to forty percent without damage, which is greater than the maximum eighteen percent stretch caused by maternal forces of labor alone as found by Dr. Grimm. Dr. Grimm claims that a complete avulsion, such as happened to Molly, can occur with a fourteen to eighteen percent stretch. In so concluding, she referenced a study done on adult rats, which observed the flexibility of the lumbar and sacral nerves of the rat, not the brachial plexus, and found that up

11

to fifteen percent of the adult rats suffered nerve rupture between an eleven to twenty percent stretch. She does note that infant nerves are more flexible than those of adults but maintains that a rupture can occur in infants at this stretch. No other expert in this matter has supported this theory that a nerve avulsion can occur in an infant at that level of stretch. Dr. Grimm attempts to circumvent this by asserting that Molly was part of a small percentile of infants whose nerves would avulse at a much lower stretch percentage, but she provides no evidence to indicate that Molly was somehow different from the average newborn.

Dr. Grimm asserts maternal forces of labor were strong enough to cause Molly's injury, despite acknowledging that her mother was so exhausted at the time of birth that she was unable to deliver Molly's head without assistance. To the contrary, Dr. Elias himself testified that "in Ms. Labauve's [sic] case, after pushing for some time, it was becoming apparent that either she was fatigued, she was tired, she was frustrated, and so in order to help facilitate the baby coming down, we apply forceps." It is obvious from his testimony that Mrs. LaBauve was unable to exert sufficient force to deliver the child naturally without the assistance of forceps and pressure applied by Dr. Elias. When faced with this, Dr. Grimm postulated that there must have been something physiologically particular as to Molly that made her susceptible to injury; again, a theory no other expert ascribed to, including Dr. Elias, as is more fully detailed later within this opinion.

It is well recognized in our law that an expert's opinion must be factually based and can be rejected when based upon assumed facts not supported by the record. *Ayres v. Beauregard Elec. Co-op., Inc.*, 94-811 (La.App. 3 Cir. 9/6/95), 663 So.2d 127, *writs denied*, 95-2432, 95-2434 (La. 12/15/95), 664 So.2d 455. Here, Dr. Grimm offered no factual support for her theory that something particular to Molly precipitated the injury, and it was, therefore, error to allow her to testify as such.

Expert scientific testimony must rise to the threshold level of reliability in order to be admissible. *State v. Foret*, 628 So.2d 1116 (La.1993). Reliability is ensured by the requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 1122. It requires more than "subjective belief or unsupported speculation." *Daubert*, 113 S.Ct. at 2795. Speculation is the act of theorizing about matters over which there is no certain knowledge. BLACK'S LAW DICTIONARY 1435 (8th ed. 2004). The *Daubert* test is especially important as there is a possibility that the expert testimony can be misleading and prejudicial if the trial court's gatekeeping role is not properly satisfied. *See Daubert*, 113 S.Ct. 2786. Suggestions as to how a trial court may fulfill its gatekeeping role include:

> [W]hether the technique had been subjected to peer review and/or publication, the known or potential rate of error, the existence of standards controlling the technique's operation, the technique's refutability or, more simply put, testability, and, finally, an incorporation of the *Frye* general acceptance in the scientific community as only a factor in the analysis.

*Foret*, 628 So.2d at 1122.

Dr. Grimm's conclusions, based upon her computer simulations, are not in line with the accepted conclusions of the current medical community regarding the amount of force required for the type of injury suffered by Molly and whether the maternal forces of labor are capable of causing such an injury. She is not a part of the medical community herself but rather has a Ph.D. in engineering. She has no experience birthing children or treating children with brachial plexus injuries. Further, in assessing Dr. Grimm's methodology, we cannot say she has proven that her conclusions are reliable. There is no evidence regarding whether her means of data collection, her simulation studies, or her conclusions regarding the capabilities of maternal forces of labor have been peer reviewed or accepted into the medical

13

communities of obstetrics, orthopedics, or neurosurgeons who view and treat brachial plexus injuries regularly. The controversial nature of the evidence is only exacerbated by the existence of studies showing that hospitals that have focused training on shoulder dystocia have managed to essentially eliminate brachial plexus injuries.

"While not all experts are created equal and may often be assessed on credibility grounds, *Daubert* and its progeny still mandate unsubstantiated methodology that is patently unsound be stricken to protect the sanctity of the fact finding process." *Godchaux v. Peerless Ins. Co.*, 13-1083, p. 8 (La.App. 3 Cir. 6/4/14), 140 So.3d 817, 823, *writ denied*, 14-1411 (La. 10/3/14), 149 So.3d 801 (citing *Ryan v. Zurich Am. Ins. Co.*, 07-2312 (La. 7/1/08), 988 So.2d 214). We find Dr. Grimm failed to properly demonstrate how her findings conform to accepted medical and scientific principles in accordance with *Daubert* and how her methodology is reliable; thus, the evidence should be excluded. Unreliable testimony is "inefficient, misleading, and prejudicial." *Foret*, 628 So.2d at 1126. As Dr. Grimm's offered testimony does not satisfy the necessary requirements of *Daubert*, we conclude the trial court abused its discretion in admitting her testimony into evidence.

We further find that the combination of the admission of Dr. Grimm's testimony as well as the improper limiting of Dr. Kozin's testimony was legal error and an abuse of discretion that prejudiced the jury, leading to its inconsistent determination. We accordingly vacate the judgment of the trial court and, thus, a *de novo* review is warranted. *See Godchaux*, 140 So.3d 817.

## *DE NOVO* REVIEW

In this medical malpractice case, the burden was on the LaBauves' to prove by a preponderance of the evidence: (1) the standard of care applicable to the

14

medical provider, Dr. Elias; (2) that Dr. Elias breached the standard of care; and (3) a causal connection between the breach and the resulting injury. La.R.S. 9:2794(A). It is clear from the record that Molly suffered a shoulder dystocia event and a brachial plexus injury when Dr. Elias used traction to dislodge and deliver her. The only real question is whether Dr. Elias breached the standard of care in responding to Molly's shoulder dystocia during delivery. An unsuccessful course of treatment is not per se an indication of malpractice. *Chaney v. State, Dep't. of Health and Human Res.*, 432 So.2d 256 (La.1983). In order to properly ascertain whether a breach occurred in the case at hand, we must first determine the applicable standard of care.

In a medical malpractice case, the plaintiff has the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

La.R.S. 9:2794(A).

The facts herein are akin to the facts of *Salvant v. State*, 05-2126 (La. 7/6/06), 935 So.2d 646. There, the trial court, after a trial on the merits, found that the plaintiffs failed to prove that the physicians involved breached the standard of care in causing brachial plexus injuries to a child during delivery when they encountered

15

shoulder dystocia. The supreme court noted that the right-arm injury suffered by the child was not the type of brachial plexus injury caused by the improper handling of a shoulder dystocia when it was the left shoulder that became lodged during the birthing process.

Although brachial plexus injuries can occur in connection with shoulder dystocia when excessive traction is applied to the child's head and neck, the evidence presented in *Salvant* provided a reasonable factual basis for the trial court to find that the plaintiffs failed to prove that either of the two delivering physicians were negligent in their treatment of the shoulder dystocia or that such negligence caused the brachial plexus injury. That the child presented right occiput anterior (ROA) during delivery was supported by substantial direct medical evidence. Members of the medical review panel testified that in this position, an injury to the right arm was highly unlikely. *Id.*

Utilizing the manifest error standard of review, the supreme court reversed the decision of the court of appeal and reinstated the trial court judgment in favor of the defendants. Pertinent to this case, however, the supreme court took note of the physician standard of care in shoulder dystocia cases based on the evidence presented therein, as follows:

> The standard of care in handling a case of shoulder dystocia was established by the documentary evidence and the medical testimony as follows. First, the McRoberts maneuver may be attempted, which involves "hyperflexion and abduction of the hips causing cephalad rotation of the symphysis pubis and flattening of the lumbar lordosis that frees the impacted shoulder." Then, or at the same time, suprapubic pressure may be used to assist in dislodging the impacted shoulder. If those attempts fail, direct fetal manipulation, such as the Wood's corkscrew maneuver, wherein the physician inserts a hand into the birth canal and onto the baby's back and turns the baby to dislodge the shoulder, may be attempted. After that, there are more drastic measures that may be taken in order to prevent death of the baby.

*Id.* at 651-52.

In this case, the standard of care was laid out by Plaintiffs' expert Dr. Edith Gurewitsch Allen (Dr. Gurewitsch). She was accepted as a medical expert practicing in the field of obstetrics and is Executive Vice Chair of Albert Einstein College of Medicine, a research-intensive medical center with one of the largest OB/GYN departments in the United States. Prior to that position, she served as a faculty member at Johns Hopkins Medical School. She has researched and written extensively about shoulder dystocia and the methods by which permanent injury to the brachial plexus can be avoided during the birthing process. She was awarded an extensive grant from the Centers for Disease Control to develop a model for determining how brachial plexus injuries occur and how they can be avoided during a shoulder dystocia event. She and her husband, Dr. Robert Allen, a biomedical engineer, invented a model shoulder dystocia simulator, which is used to train clinicians on how to reduce shoulder dystocia and avoid injury to the child. She both performs deliveries and teaches the necessary techniques for reducing shoulder dystocia to medical students.

Dr. Gurewitsch laid out the standard of care relative to responding to shoulder dystocia. As obstetrics is a specialty, the standard of care refers to the actions a reasonably and similarly trained obstetrician/gynecologist faced with the same or similar circumstances would have or should have performed. Dr. Gurewitsch explained that while the child is in the birth canal, the umbilical cord is compressed and delivers less blood and oxygen through the cord to the child. In births without shoulder dystocia, this is a quick process with no impact on the child, but if the child is stuck in the birth canal too long, this can cause injury related to oxygen deprivation. Dr. Gurewitsch explained that generally during delivery, the child's head begins the process facing one side or the other but then rotates ninety degrees and is born facing the floor. The child's body will mimic this rotation which

17

generally allows the shoulders to slip under and avoid being caught on the mother's pubic bone. However, shoulder dystocia occurs when the child's shoulder catches on the pubic bone, preventing the child from being completely delivered.

Dr. Gurewitsch testified that the general accepted teaching when responding to shoulder dystocia is that the child should be delivered within four minutes to avoid the complication of oxygen deprivation. She then noted that this risk must be balanced against the risk of using an improper technique, which can cause injuries to the child such as broken bones or stretched nerves in the arm. She testified that physicians are trained to calmly manage a shoulder dystocia event with the use of various maneuvers to free the shoulder in such a way as to minimize the risk of injury to the child's brachial plexus.

Dr. Gurewitsch explained that there are a total of eight maneuvers which could be used. These include the methods attempted by Dr. Elias, being the McRoberts maneuver and then suprapubic pressure, both of which involve the delivering physician applying traction of approximately ten pounds of pressure to the child's head in order to facilitate delivery. Mild traction is proper so long as it is axial, meaning the child's head is in line with his or her neck. If the McRoberts maneuver and the application of suprapubic pressure are unsuccessful, then the standard of care requires the use of other maneuvers to free the child. These include delivery of the posterior arm, Gaskin, Woods screw, and Zavanelli techniques, which do not involve any form of traction on the child's head. Dr. Gurewitsch testified that these maneuvers can be done expeditiously with their effectiveness almost immediately apparent and if the first is not successful, the clinician is to move to the next until one is successful. It is an accepted fact that if these maneuvers are not properly performed so as to timely deliver the child with minimal risk of injury, there can be serious injury to the child's brachial plexus.

18

According to Dr. Gurewitsch, a child's brachial plexus nerves are much more elastic than those of an adult, allowing for close to a fifty percent stretch, while adult brachial plexus nerves can only stand being stretched roughly fifteen percent before tearing. Tearing is caused by the separation of the head and neck away from the shoulder, which is why it is imperative that physicians only apply axial traction rather than lateral traction, which is an ear-to-shoulder motion where the child's head and spine are no longer in line. Dr. Gurewitsch testified that a tear in the brachial plexus nerves will occur when the head is moved more than forty-five degrees below the horizontal level and that the nerve roots will tear or be pulled away from the spinal cord when pulled more than sixty degrees below horizontal.

In Molly's case, her brachial plexus nerves were fully avulsed, meaning they were pulled completely out of the spinal cord from the root. This is the most severe injury one can suffer to the brachial plexus. The scientific literature regarding the mechanisms of brachial plexus injuries with multiple avulsions of the nerve roots states that these injuries can only be caused by a pulling force, described by Dr. Gurewitsch as "a very sharp, very lateral, forceful pull and not a push and not a compression." She explained that uterine forces, or maternal forces of labor, are in a single direction, pushing the child from behind, and that uterine forces are all along the child's axis. There is no evidence that uterine forces alone could turn a child's head lateral to his or her spine, which has to occur in order for the nerve roots to be torn from the spine. If such a thing were possible, the type of brachial plexus injury suffered by Molly would be more common given the relative frequency of shoulder dystocia presenting during delivery. Dr. Gurewitsch was adamant that "an injury of this extent was caused and that could only have happened if you pulled sharply downward in excess of 40 to 50 pounds of force, which means using [Dr. Elias's] body weight, leaning and pulling hard on the baby."

19

Defendant's argument centers around the classification of Molly's shoulder dystocia as an emergency and that delivering her alive and without oxygen deprivation-related injuries was paramount. Dr. Gurewitsch acknowledges this, clarifying:

> When we get to a choice between life and limb at, you know, the four-minute mark or something like that and you've tried all these other options and nothing seems to be working, it might be justified to pull harder and get the baby out, and you might end up with an injury that you couldn't avoid.
>
> . . . .
>
> There could be a circumstance where that head-to-body interval is four minutes, five minutes, six minutes in which case it would - - the concern for being deprived of oxygen would take precedence over trying to be protective of the brachial plexus.

In the case at hand, Molly was born within forty-five seconds of her shoulder dystocia. There is no evidence of extenuating circumstances that would shorten the available time period for a safe birth from the accepted four minutes such as if the umbilical cord were wrapped around the child's neck. At forty-five seconds, there is no risk of brain damage from oxygen deprivation. The medical review panel's opinion in this case does not mention the amount of force or traction that was used or the direction of that force. Dr. Elias has stated that he only used "gentle traction" during delivery. However, Dr. Gurewitsch noted her previous studies, which showed that in instances when clinicians were asked, after the fact, to rate the amount of force used, they usually rated the force as half that of what was actually applied. It is rare to get an accurate self-assessment of the amount of force applied when one is asked to estimate it after the fact. Here, it is clear from the extent and severity of Molly's injury that a great amount of force was applied and that it was applied in a direction that caused the stretching and tearing of Molly's brachial plexus nerves. Dr. Gurewitsch noted that "the extent is how many nerve roots and the nature is that

20

they were evulsions [and that] can't happen without stout force that's not just moderate or gentle traction."

As stated, the question of whether the amount of force exerted by Dr. Elias was within the standard of care or outside the standard of care relates to the circumstances of the delivery and is why the time period of forty-five seconds is so relevant in terms of the maneuvers and options that were available. Molly suffered a global brachial plexus injury, where her nerve roots were fully pulled from her spinal cord. When there is a nerve root avulsion, there is very little that can be done to repair the damage as those nerves no longer have a connection to the brain. In most cases, normal function will not be restored. This is the injury that Molly must live with for the rest of her life. Dr. Gurewitsch is clear that forty-five seconds is too far from four minutes to justify prioritizing the risk of asphyxiation over trying to avoid a brachial plexus injury, and it is improper to use excessive traction without first attempting other, less forceful maneuvers given the circumstances at hand.

Dr. Robert Allen, a biomedical engineer, also testified as an expert for Plaintiffs. He explained the relationship between biomechanical engineering and brachial plexus injuries in infants resulting from shoulder dystocia by referencing a 1943 journal article by an obstetrician that stated that "the passage of the fetus through the pelvis during birth is an engineering problem." Dr. Allen's research is primarily related to shoulder dystocia, its causes and how injuries can be avoided. He currently works at the Albert Einstein College of Medicine, where he teaches obstetricians and others how to deliver babies during shoulder dystocia events so as to avoid brachial plexus injuries. He also authored a study while working at Johns Hopkins University that used specialized gloves to measure and record the amount of force or traction being used by physicians during delivery.

21

Dr. Allen testified as to the general maneuvers that are undertaken by physicians in the event of shoulder dystocia. He stated that the McRoberts maneuver is generally done first, which involves positioning the mother in such a way as to actually tilt the pelvis in an attempt to get the child's shoulder to slip off the pubic bone. This maneuver is effective roughly fifty percent of the time. He stated that if the McRoberts is unsuccessful, a second tactic is to use suprapubic pressure in order to force the child's shoulder to move off the pubic bone. Both of these maneuvers are traction based. Traction is the force that is applied by the physician in order to deliver the child. Dr. Allen specifically noted in regards to Molly's nerves being fully avulsed that it is "significant in the amount of traction and perhaps twisting that is needed to produce the injury." Both of these maneuvers were used in the case at hand with Molly eventually being delivered with the use of forceps approximately forty-five seconds after the shoulder dystocia was diagnosed.

Dr. Allen also noted three other maneuvers that are generally accepted for treating shoulder dystocia, which involve manipulating the child rather than the mother, including manual rotation of the child, delivery of the posterior arm, and the Woods screw maneuver. Dr. Allen testified that the use of these maneuvers could have avoided Molly's injury, noting a particular study that showed that after training physicians in these maneuvers, the hospital was able to eliminate permanent injuries from shoulder dystocia altogether. He explained, as follows:

> As I indicated when I was demonstrating the pelvis and the fetus was that the manipulation maneuvers, the fetal manipulation maneuvers, specifically delivery of the posterior arm or rotation of the shoulders, do not require force being applied to the head, and, in fact, they're more effective than the maternal maneuvers mechanically.

A brachial plexus injury is caused by lateral motion such as moving the head to one side and away from the opposite shoulder. According to the available medical literature, the only stated cause for an injury such as Molly's is the application of

22

lateral traction by the delivering physician. Though the American College of Obstetrics and Gynecology notes that a brachial plexus injury may have other causes than excessive traction, such claims do not make a distinction between permanent and temporary injuries. Molly suffered a global brachial plexus injury that will have permanent consequences. There is no evidence in the medical record indicating that Molly or her health and development played any role in the injury she sustained. Dr. Elias himself stated that Mrs. LaBauve had a normal laboring process, that Molly's fetal heart strip, which monitors the condition of the child during birth, was normal, and that Mrs. LaBauve had no diagnosis of any medical condition affecting her or Molly prior to delivery.

Dr. Kozin, Molly's treating physician who specializes in child upper extremity or brachial plexus injuries, also testified. He explained that in the case of brachial plexus injuries, there are two main types of surgeries that can be performed. One is a primary nerve surgery where the nerves are moved and repaired. Dr. Kozin stated that this type of surgery is rare with him performing between twenty and thirty surgeries a year. The second type of surgery involves moving tendons or cutting bones and fusing joints. This is the most common type of surgery and is the surgery that Molly received. Dr. Kozin explained that grafting the nerve is a much better option in terms of surgery but that this option was not available to Molly because her nerves were fully avulsed from C5 to T1. A nerve avulsion occurs when the nerve root is pulled completely from the spinal cord, and an avulsion of the brachial plexus affects the entire arm of the affected person. As Dr. Kozin explains:

> What we say is the brachial plexus is a series of nerves that come from the spinal cord. And we say there are five roots - - like roots on a tree, just like a tree starts - - and these routes come from the neck, and then they form the brachial plexus.

23

So these five roots . . . they look like a wire. And in this wire there is insulation on the outside and then there is all these fiber optic cables that we call axons and each nerve root has 20,000 axons.

It is pretty tough. It looks like a wire. There is insulation and then axons or fiber optic cables, and we will talk about it, but it will stretch before it tears.

What happens is the C5 and C6 nerve root combine to make what we call the upper trunk. C7 continues all by its lonesome as the middle trunk. And then C8 and T1 combine to form the lower trunk. Five roots, three trunks.

Now, these trunks which look like pencils exit the neck, right. They then go beneath the clavicle, the collar bone, right here and then they extend in to the arm, and they control all movement and all sensation.

So when you think of something in your brain to move your arm, it comes from the brain, down the spinal cord, out the brachial plexus, into the arm, and then does whatever motion you are thinking, such as bending your elbow.

Molly suffered an avulsion at C5, C6, C7, C8, and T1. The C5-C6 nerve root controls a person's shoulder elevation, their ability to bend their elbow, and their ability to turn their palm upward, which is known as supination. The C7 nerve root mainly controls extension; extension of the elbow, which refers to straightening the elbow, extension of the wrist, which allows a person to flex their hand straight in front of them parallel to their face, and extension of the fingers. The C8-T1 nerve root allows for grasp and fine motor skills, including crossing your fingers, opening bags, and manipulating buttons and zippers. Due to the specialized nature of these nerve endings, certain inferences can be made about an injury based upon the child's abilities. Dr. Kozin noted that when viewing a brachial plexus injury for the first time, he works backwards to form a diagnosis. A child's inability to grasp or hold things is indicative of an injury at C8 and T1 nerve roots, and so on. If the child cannot extend their elbow, wrist, or fingers, their C7 nerve root is injured, and if they cannot move their elbow, it is the C5 and C6 nerve roots that have been affected.

24

A brachial plexus injury is caused by a separation between the head and neck in one direction and the shoulder in the other direction. The thing causing this separation is the injuring force. First the C5 and C6 nerve roots are injured, which has a high to moderate prognosis for recovery. If more separation between the head and neck and the shoulder occur, the C7 nerve root is implicated. These injuries are cumulative, and if the separation propagates further, the C5, C6, C7, C8, and T1 nerve roots are all injured. This is known as a global or total injury and is the worst brachial plexus injury one can have. The force required to cause these injuries is also cumulative, meaning it takes more force to cause injury the farther down the plexus one goes. If a nerve is stretched, there is a possibility of that nerve healing. If a nerve is stretched to the point of breaking, surgery is required in order to mitigate the damage. However, if a nerve is pulled out of the spinal cord, there is no way to reattach the nerve that would allow it to send signals to the brain. This is the injury suffered by Molly.

Dr. Kozin first examined Molly on July 2, 2012, when she was six months old. According to his records, her arm was completely flaccid save for minor finger motions, and there was no evidence of any recovery at C5, C6, or C7. Molly had her first surgery on July 20, 2012, which allowed Dr. Kozin to observe the nerves of her brachial plexus. During the surgery, Dr. Kozin brought Molly's phrenic nerve, that controls her diaphragm, up from the ribs in an attempt to implant the nerve into the brachial plexus. In Molly's case, every injury she sustained was an avulsion with no connection between the nerve roots and the spinal cord. Thus, each location where the nerve roots exited the cervical spine into the plexus was empty. The C5, C6, and C7 nerve roots had been pulled out of the spinal cord and were lying on top of the muscle that they usually run behind. Dr. Kozin noted that the avulsion of the

25

C5 nerve root was particularly surprising as an avulsion at that level requires significant force and testified to such.

> A: So there had to be substantial separation between the shoulder in one direction and the head and neck in the other direction, because all five nerve roots are injured - - which is global, total, the worst - - and Molly had literally five root avulsions, three being completely, frankly avulsed and on top of the muscle. And that's due to the force applied at the time of the birth.
>
> Q: The force applied externally?
>
> A: The force applied by the delivery. This is not due to some magical force that occurred while the child was traversing the birth canal or in the uterus.
>
> Q: Otherwise known as the maternal forces of labor?
>
> A: Correct.
>
> Q: How strong do you feel in your opinion that this injury occurred by the force applied by the delivering physician?
>
> A: I am certain the force applied by the delivering physician led to this injury. What I said before is, I do think the maternal avulsive forces are present, and I do think those forces themselves can lead to mild stretching of the brachial plexus. But what those forces do not lead to - - in no way, shape, or form is Molly's injury that we talked about earlier.

No medical or scientific literature claims that an injury as severe as the one Molly suffered could be caused by anything other than the delivering physician. Dr. Kozin acknowledged that the birthing process can be "rough and tumble" and can cause mild plexus injuries but that injuries such as those Molly has suffered are indicative of much greater levels of force. Dr. Kozin saw Molly again in May of 2013 after her initial surgery and noted that there had been no noticeable recovery from her injury, which he stated was to be expected given the relatively short period of time since the surgery. Molly underwent a second tendon transfer surgery on September 5, 2014 to correct her shoulder because the muscle growth she had

26

achieved since the first surgery was uneven and could lead to a deformity of the ball and socket joint if left unchecked.

Dr. Kozin saw no biological variability which would make Molly more susceptible to injury, and he stated that all of her wounds healed as expected. He opined that the shoulder dystocia and resultant pressure on the umbilical cord was the cause of Molly's low Apgar[4] score at one minute after birth, rather than the low score being indicative of Molly's particular vulnerability to injury; an opinion bolstered by Molly's strong Apgar score at five minutes.

Dr. Kozin noted that even with the medical intervention Molly has and will continue to receive, she will be dealing with this injury for the rest of her life. He testified that "right after the operation, I knew that 20 years from the date of the operation, Molly was not going to be able to extend her wrist or extend her fingers because I couldn't reconstruct that portion of the plexus." The extent of her injury means that Molly's daily life is affected from the moment she gets up in the morning until she goes to bed. It affects her ability to dress, shower, wash her hair, do homework, or participate in extracurricular activities. Nerve regeneration occurs for three to four years from the time of injury. Given that Molly was six years old at the time of trial, she cannot expect any substantial improvements in her nerve growth and can only learn to mitigate the damage that has been done.

In his defense, Dr. Elias offered the opinion of the medical review panel and had one of the reviewers, Dr. Ralph Joseph Fernandez, testify. Dr. Fernandez, an OB/GYN, testified that he has known Dr. Elias for many years and that Dr. Elias delivered one of his children. Dr. Fernandez stated that Dr. Elias acted reasonably and within the standard of care when he delivered Molly. He stated that a case of

---

[4] An Apgar score refers to a test given to newborns at one minute and five minutes after birth. The test checks a child's heart rate, muscle tone, and other vital signs to assess the child's health to see if extra medical or emergency care is needed.

27

shoulder dystocia during the delivery process is a nightmare scenario for the delivering physician and is a life or death event for the child and potentially the mother. Dr. Fernandez explained that the child becomes trapped in the birth canal, which can cause the child to be deprived of oxygen. If the shoulder dystocia is not quickly resolved and the child delivered, the lack of oxygen can "eventually result in death or possible brain damage." Molly was delivered approximately forty to forty-five seconds after the diagnosis of the shoulder dystocia.

Dr. Fernandez testified regarding the standard of care, noting that the first maneuver to use once faced with shoulder dystocia is the McRoberts maneuver followed by suprapubic pressure, both of which involve the use of traction. However, he admitted that he is not an expert in the extent of the forces necessary to cause Molly's injuries. He also admitted that he did not know the severity of Molly's injury. Dr. Fernandez agreed that the McRoberts and suprapubic pressure maneuvers can be used with traction but that the traction applied should be relatively the same as with a normal delivery. He stated the medical review panel opinion did not address the question as to "the amount of force, the direction of force, whether the force was actual - - axial or lateral" nor did it address "the amount of time in which the doctor had to make this delivery." When asked the question "[i]f there's an alternative to doing additional maneuvers, would it not be reasonable for the physician to do those additional maneuvers rather than pulling hard on the baby during a suprapubic maneuver and causing injury to the brachial plexus" he replied "[w]ell, first, in fairness, I do not know how hard pulling occurred." Finally, he stated in response to Plaintiff counsel's questioning as to whether Dr. Elias could have caused Molly's injury: "I believe part of it can be a factor, but I - I do not know the cause of this injury."

28

Dr. Fernandez' testimony is in stark contrast to Plaintiffs' experts, Dr. Gurewitsch and Dr. Kozin, both of whom gave the opinion that a force of upwards of 40 to 50 pounds of pressure would be required to cause the injuries that Molly sustained. They stated the only way that amount of force could have been applied was via Dr. Elias. Dr. Gurewitsch stated directly that such forces are outside the standard of care and no one refuted such, except in a dire emergency situation where the child is faced with oxygen deprivation of between four to five minutes. Dr. Fernandez' opinion is simply that the conduct of Dr. Elias was within the standard of care because the maneuvers he used were successful since Molly was born alive, even though she was severely injured.

Dr. Elias testified on his own behalf. He recounted Mrs. LaBauve being admitted and her laboring process, which he described as "normal." He noted that by the time Mrs. LaBauve was fully dilated and ready to push, she had been in labor for several hours. He testified regarding his use of forceps that "it was becoming apparent that either [Mrs. LaBauve] was fatigued, she was tired, she was frustrated, and so in order to help facilitate the baby coming down, we apply forceps." He noted that she could not generate enough force to "expel the fetus." During delivery, forceps are applied around the child's head in order to help facilitate the birth.

Dr. Elias maintained that he did not breach the standard of care and that the only force used during Molly's delivery was "gentle traction." He further asserted that the force used was necessary for the safe delivery of the child, again pointing to the potential lack of oxygen and the dangers of such and noting that shoulder dystocia can quickly become an emergency. However, when Dr. Elias was asked to elaborate on the emergency timeframe, he was unable to explain how the danger of hypoxia was imminent in this case.

29

Q: What - - but what - - do you understand then? As an expert in the field of obstetrics, what do you understand the time period is in which you have to safely attempt to reduce a shoulder dystocia without damage to the baby?

A: Okay. There's been a lot of literature written on time before a baby will start to suffer an anoxic brain injury. Anywhere from three to five to six minutes. Williams clearly stated a quote earlier that the quicker the infant is delivered the less likely there is to be a longstanding injury to the baby.

Q: So, as I understand what you're saying then, the quicker you deliver the baby regardless of how you do it is okay because the shorter that you make the time to deliver the baby you're reducing the risk of brain damage to the baby?

A: You're understand [sic] incorrectly. I simply stated that Williams clearly states the time that - - the interval between recognizing a shoulder dystocia and when the shoulder dystocia can be reduced is very important. I never said that you can disregard the baby to deliver it.

Dr. Elias also testified about the importance of being aware of the amount of time a child suffering shoulder dystocia has their head on the mother's perineum, in order to ensure awareness of the window of opportunity to safely deliver the child and ensure that the child does not suffer from oxygen deprivation. Most shoulder dystocias are resolved within two minutes with no serious or permanent injury to the child. However, here, Dr. Elias delivered Molly within forty-five seconds of the shoulder dystocia using only traction-based maneuvers.

We are not constrained here by the manifest error standard of review. The only explanation offered by the defense as to the cause of Molly's injuries was Dr. Grimm's unsubstantiated non-fact-based opinion that Molly must have had some mysterious, unknown physiological defect or condition that caused her to be more susceptible to such an injury. Dr. Grimm is not a physician, and no physician, including Dr. Elias, has supported her assumption. Further, we have already determined that Dr. Grimm should not have been permitted to testify, as her opinions

do not comport with the standards of *Daubert*, which require not only relevancy but also reliability.

Additionally, there is no evidence of anything physiologically wrong with Molly that would contribute to the massive injury she suffered during the birthing process. Dr. Elias testified directly that Molly's Apgar scores were "very good for a baby with a shoulder dystocia." He further testified that from the time of admission, Mrs. LaBauve had a normal laboring process, though not a normal delivery process because of the shoulder dystocia issue, and Molly's fetal heart strip was normal, indicating that she was not experiencing physical distress. Mrs. LaBauve was not diagnosed with any medical condition affecting her or her child prior to the dystocia, according to Dr. Elias.

The only reasonable cause presented by the testimony and opinions of the multiple experts is that, during the delivery, excessive force was applied to Molly's head and neck, in excess of forty pounds, which caused the complete tearing of the nerve roots from the spine at the C5, C6, and C7 levels and the partial tearing of the nerves from the spine at C8 and T1. This forceful tearing of the nerve roots is the exact cause of Molly's current disabling condition. The clarity of the testimony of Dr. Gurewitsch, Dr. Kozin and Dr. Allen is overwhelming as to this point such that reasonable minds cannot differ. Excessive force caused this injury. The standard of care requires force of no more than approximately ten pounds of pressure be applied by the delivering physician unless all other measures fail. In this case, the evidence is clear that the window of opportunity for attempting less severe measures was wide open, as Molly was delivered within forty-five seconds of the discovery of the shoulder dystocia, well within the minimum of four to five minutes to address the problem before brain injury or death became imminent. Dr. Elias testified as to the delivery as follows:

31

Q: Now, is it not correct that the documentation of the shoulder dystocia is the following: The patient had a significant shoulder dystocia that was reduced with McRoberts and suprapubic after approximately 40 to 45 seconds of the infant's head on the perineum. After the anterior shoulder was delivered, the rest of the infant was quickly delivered. Is that the only documentation that you have of the shoulder dystocia?

A: Yes.

Q: You do not document the nature or direction of the traction involved in the shoulder dystocia; is that correct, sir?

A: That is correct.

Q: You - - when you documented the use of the forceps, you used the term "gentle traction," did you not? Do you recall that, sir?

A: I do.

Q: And did you not use the term "gentle traction" when referring to the use of the forceps?

A: Correct.

Q: When you were referring to the shoulder dystocia, there is no such identification of the nature of the traction, but you do refer to the shoulder dystocia as significant, is that not correct, sir?

A: That is also correct.

Q: You do not document how long McRoberts was used or the length of the traction for McRoberts?

A: Correct.

Q: You do not document how long suprapubic was used or the duration of traction with suprapubic; is that correct?

A: Correct.

Q: You do not document how many times you applied traction, - -

A: Correct.

Q: - - correct? And the operative report does not state that the shoulder dystocia was easily reduced; is that correct, sir?

A: I didn't understand the last part. You're - - you're - - you're speaking down.

32

Q: The operative report does not state that the shoulder dystocia was easily reduced?

A: Correct.

While Dr. Elias testified that he applied "gentle force" in the use of forceps, there is no documented description of the force applied during the first two maneuvers utilized after the shoulder dystocia event was identified. The physical evidence of the injury, which is indisputable, tells a completely different story than the use of gentle traction. This is the worst of the brachial plexus injuries that can be suffered according to Dr. Kozin, who actually saw Molly's nerves that had been ripped from her spine, and the severity of this injury can only be caused by excessive force pulling the head and neck away from the shoulder in a twisting motion. Further, Dr. Allen's published and peer-reviewed study showed that while physicians are fairly accurate at estimating low levels of force, "during a shoulder dystocia event when those forces are – are applied they tend to underestimate those forces," making Dr. Elias's assertions of the use of "gentle traction" unreliable when considering the extent of Molly's injury.

After a *de novo* review of the record, we find that Plaintiffs have proven by a preponderance of the evidence the applicable standard of care, that Dr. Elias breached that standard while reacting to the should dystocia event, and that the breach caused Molly's injuries.

## DAMAGES

We now turn to an award of damages appropriate for the permanent injuries suffered by Molly. Louisiana Revised Statutes 40:1231.2(B) provides that "[t]he total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1231.3, shall not exceed five hundred thousand dollars plus interest and cost."

33

Louisiana Revised Statutes 40:1231.3(B)(1) defines future care and medical benefits to include "[a]ll reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, incurred after the date of the injury up to the date of the settlement, judgment, or arbitration award" as well as "[a]ll reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provisions of such services, after the date of the injury that will be incurred after the date of the settlement, judgment, or arbitration award." La.R.S. 40:1231.1(B)(1)(a) and (b).

## *General Damages*

Molly's injury, which is best described as a severe and irreparable nerve avulsion, has had a serious impact on her ability to participate in recreational activities in which other healthy girls her age would engage. She was only six years of age at the time of the hearing in 2018, and will have to live with this disability for the remainder of her life. She will have to adapt, and there will be difficulties and setbacks. Arguably, as she goes through the normal aging process and enters into her twilight years, her disability will likely become more problematic. Molly's parents testified that she cannot bathe, dress, or tie her own shoes without assistance. The teacher's assistant from Molly's pre-kindergarten class testified about Molly's difficulty in being able to clean herself in the restroom without assistance and other modifications that were required to allow her to be able to achieve any form of independence.

Lorain Gilbert Fontana, a physical therapist who has worked with Molly since she was twelve days old, testified regarding her limitations, noting that she has

34

incomplete control and movement of her shoulder, elbow, hand, and wrist and no dexterity in her hand. Ms. Fontana explained:

> The muscles in the arm are innervated by nerves that come out of the neck at different levels. There's seven cervical levels, C1 through C7. Molly's injury involved 5, 6, 7, and part of T1. The muscles that she has are partially innervated. In other words, there's - - the nerve is going to some of the muscle. Some of the surgeries that she's had helped bring a nerve from one part of her body and channel it up through her chest and attach it in her arm to give her biceps because her C5-6 was completely pulled away from the spinal column. So she has limited range of motion based on the strength of the muscles. Some of the muscles are innervated partially. Some of them are innervated fully, and some of them are not innervated at all. The muscles that lift her hand up, the wrist extensors, are not innervated at all. She can't come up at all.

Ms. Fontana testified that based upon her experience, Molly's limitations will be lifelong. She stated that the majority of children with brachial plexus injuries require regular physical therapy until they reach their teenage years, when skeletal maturity has been attained and the children are able to take over their own care in terms of stretching, exercises, and things of that nature. She was also emphatic that Molly would continue to require splints and orthotics as she grows older, stating, "Positioning is − is crucial in terms of the development." She also testified about Molly's current and potential pain from the injury, as follows:

> Molly has complained of pain. At one point, she - - and - - it's not just Molly, but this is something that I've had to deal with several kids with brachial plexus injuries. As nerves come back and they get strange sensations, they tend to bite their fingernails, chew on their fingers, and at one point, Molly got a bone infection because she had put her fingers in her mouth, and I believe it was due to the fact that she was getting some sensations that she didn't like, so as a child, they often put things in their mouth, and they basically put their fingers in their mouth, and they'll get infections in the fingernails. They'll get - - sometimes the infections will go down into the bone.

The facts of this case, while not identical, are very similar to those in *Steen v. Professional Liability Insurance Co. of America*, 06-1230 (La.App. 4 Cir. 6/27/07), 962 So.2d 470, *writs denied*, 07-1570, 07-1590 (La. 10/26/07), 966 So.2d 577, 578,

where after presenting with shoulder dystocia during delivery, the child was born with a brachial plexus injury. The court of appeal affirmed the trial court's finding that the physician breached the standard of care in the use of traction in an attempt to deliver the child experiencing shoulder dystocia during the birthing process. The court further affirmed a general damage award of $500,000.00 plus interests and court costs, finding that the plaintiffs proved that the physician's malpractice caused permanent and life-long injuries with damages exceeding the statutory cap of $500,000.00, where the child retains only fifty to fifty-five percent use of his hand and arm. In this case, Molly has a total permanent loss of use of her right arm and hand.

We, therefore, find that the general damages sustained by Molly exceed the statutory maximum and award general damages at the statutory cap of $500,000.00 plus judicial interest and court costs.

*Medical Expenses*

Plaintiffs' evidence established past medical expenses of $165,202.53 and recoverable personal expenses of $17,897.29. These amounts are undisputed. Louisiana Revised Statutes 40:1231.3(B)(1)(a) provides for the recovery of such expenses "incurred after the date of the injury up to the date of the settlement, judgment, or arbitration award." We, thus, award past medical expenses in the total amount of $183,099.82, which sum is made executory, together with legal interest thereon, to be collected pursuant to the provisions of La.R.S. 40:1231.4(B).

Plaintiffs' experts opined that Molly will require future medical, surgical, hospitalization, physical rehabilitation, and custodial services as well as drugs, prosthetic devices, and other similar materials in the future, throughout her life expectancy. Thus, we find that Molly is in need of future medical care and related benefits that will be incurred after the date of this court's finding and the amount

36

thereof. La.R.S. 40:1231.3(B)(1). These future medical expenses were given a present value of between $1,352,327.00 and $1,728,536.00 and these figures were not contested. Thus, we affix future medical expenses at $1,728,536.00, as a non-executory amount, with the proviso that the cost of all future medical care and related benefits that will be incurred after the date of this court's finding shall be considered in accordance with La.R.S. 40:1231.3(C), (D), and (E).

## DISPOSITION

Based on the foregoing, we vacate the trial court judgment based on a jury verdict in favor of the defendants, Dr. Darryl Elias, Jr. and LHA Physicians' Trust Fund. We further render judgment in favor of the plaintiffs, Kimberly Brook LaBauve and Shawnavon Lynn LaBauve, individually and on behalf of their minor child, Molly Ann LaBauve, awarding $500,000.00 in general damages, $183,099.82 in past medical expenses, and $1,728,534.00 in future medical expenses to be considered in accordance with La.R.S. 40:1231.3(C), (D), and (E) plus judicial interest and court costs. The costs of this matter are assessed to the Defendants.

## JUDGMENT VACATED AND RENDERED.

37

## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 19-848

**KIMBERLY BROOKE LABAUVE, ET AL.**

**VERSUS**

**LOUISIANA MEDICAL MUTUAL INS. CO., ET AL.**

**Pickett, J., dissents and assigns written reasons.**

I respectfully dissent from the opinion reversing the jury's verdict. In my view, the trial court did not abuse its discretion in limiting the testimony of Dr. Kozin, the orthopedist who treated Molly. The majority determines that the trial court abused its discretion because the excluded testimony concerned the **cause** of Molly's injuries, not the **standard of care** of an obstetrician.

The jury found that Dr. Elias did not breach the standard of care. The evidence presented at trial supports two views of the evidence, and the jury made a reasonable determination. The majority relies on Dr. Kozin's previously excluded **causation** testimony to determine that, when considered with the remaining evidence introduced at trial, no reasonable person could find that Dr. Elias **breached the standard of care** applicable to obstetricians.

I would affirm the judgment of the trial court.

1